LUCILE KVASNICKA, Plaintiff-Respondent, v. MONTGOMERY WARD & COMPANY, a Corporation, and IRA JOHNSON, Defendants, MONT-GOMERY WARD & COMPANY, a Corporation, Appellant.—No. 38003. —166 S. W. (2d) 503.

Division One, September 8, 1942.

Rehearing Denied, November 10, 1942.

Motion to Transfer to Banc Overruled, December 1, 1942.

*L. E. Oliphant, Elton L. Marshall* and *Watson, Ess, Groner, Barnett & Whittaker* for appellant.

362

*Clif Langsdale, Harold Marshall* and *Clyde Taylor* for appellee.

DALTON, C.—Action for malicious prosecution. Plaintiff sought $50,000 actual and $50,000 punitive damages. The jury returned a verdict for plaintiff for $8,000 ''compensatory damages only'' against defendant Montgomery Ward and Company, but found in favor of defendant Ira Johnson. Defendant Montgomery Ward and Company has appealed.

On the morning of May 25, 1936, a woman passed a forged check at the Montgomery Ward and Company's store in Kansas City. Less than a month later the handwriting in the check was identified by two handwriting experts as the same as that of an application for employment filed by the plaintiff with an employment agency. Plaintiff

was subsequently arrested (June 22, 1936) and identified (by three Montgomery Ward and Company employees, who dealt with the woman) as the person who passed the check. Thereafter, on September 12, 1936, the plaintiff was indicted by a grand jury of Jackson County, the indictment containing counts charging plaintiff with forgery of, and uttering the forged check. Plaintiff was tried on said indictment in the circuit court of said county and acquitted on both charges (February 17, 1937). The present suit was instituted May 17, 1940.

The first and principal contention on this appeal is that plaintiff made no case for a jury and that upon defendant company's demurrer to the evidence at the close of the whole case the trial court should have directed a verdict in its favor. The parties (hereinafter referred to as plaintiff and defendant company) agree that the constitutive elements of an action for malicious prosecution are: (1) The commencement or prosecution of the proceedings against the present plaintiff; (2) its legal causation by the present defendant; (3) its termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage to plaintiff by reason thereof. Bonzo v. Kroger Grocery & Baking Company, 344 Mo. 127, 131, 125 S. W. (2d) 75; Higgins v. Knickmeyer-Fleer Realty & Inv. Co., 335 Mo. 1010, 1025, 74 S. W. (2d) 805, 812. Defendant company contends that plaintiff offered no substantial evidence of "the legal causation of the prosecution of the plaintiff" by defendant company and that the "burden of proving the absence of probable cause for the prosecution of plaintiff was not met." We will consider the second proposition first and assume without deciding that defendant company caused the prosecution.

"The prevailing rule is that the finding and return of the indictment by the grand jury is prima facie evidence of and establishes probable cause unless the plaintiff in the action for malicious prosecution rebut the presumption by proof that the defendant in the action for malicious prosecution obtained or induced the indictment by false testimony before the grand jury or by intentionally withholding or concealing from the grand jury pertinent facts necessary to a full and fair investigation which were known to defendant or which he could by due diligence have ascertained, or by other improper or fraudulent means or by showing that defendant, though he did not believe the accused to be guilty, obtained or procured the indictment against him." Dawes v. Starrett, 336 Mo. 897, 905, 82 S. W. (2d) 43, 45, and cases there cited; 34 Am. Jur. 745, sec. 66; 38 C. J. 412, sec. 47.

In this case the plaintiff recognized that the burden of proof was upon her to overcome the prima facie presumption of probable cause arising out of the indictment which was alleged in the petition and shown by plaintiff's evidence. Her petition alleged "that said in-

dictment was procured without reasonable cause by the fraudulent, false and perjured statements and evidence of the defendants, their agents, servants and employees, and in addition thereto, in all of said matters said defendants, their agents, servants and employees, maliciously and fraudulently failed to disclose to said grand jury the true facts known to them, or which true facts could have been ascertained and known to them by the exercise of due diligence, bearing upon the question of the guilt or innocence of the plaintiff, of said charge; that if said defendants, their agents, servants and employees had truthfully and fairly disclosed said facts to said grand jury, it would not have returned said indictment against this plaintiff.''

The answer of defendant company alleged that it ''had reasonable and probable cause to justify the honest belief on its part, and on the part of its agents, servants and employees, which they did have, that the plaintiff was guilty of the charge of forgery and of the uttering of a forged instrument, . . . and that this defendant and its agents, servants and employees had probable cause for and were fully justified in each and every act done by them, or any of them, in connection with the arrest, indictment and the prosecution of the plaintiff, and each of said acts were done by them without malice.''

In submitting the cause to the jury the plaintiff requested, and the court gave an instruction, which advised the jury, among other things, as follows: ''and if you further find that Montgomery Ward and Company, acting through its agents and representatives as aforesaid, did wilfully, maliciously, and without probable cause aid, advise, or procure the finding of said indictment by false testimony before the grand jury, which testimony, if any, was known by said agents and representatives of Montgomery Ward and Company to be false, or which they could by reasonable care and due diligence have ascertained to be false, if the same was false, then your verdict will be for the plaintiff and against defendant Montgomery Ward and Company.''

Another instruction given to the jury at the request of plaintiff contained the following statement: ''and if you find that the defendants, or either of them, failed to use such diligence (due diligence) to ascertain such facts (facts which would have convinced a reasonably prudent man that plaintiff was not guilty of the crimes with which she was charged in the indictment), if you find such facts existed and that they could have been ascertained by the exercise of due diligence, before instituting the prosecution or continuing the same, if you believe defendants, or either of them, did institute such prosecution, then you may take these facts, if you find them to be facts, into consideration in determining whether said prosecution was without probable cause and was actuated by malice.''

We will first concern ourselves with the issues actually submitted to the jury and will not stop to determine whether the last instruction, supra, ignored the fact of the indictment, as contended by defendant

company. Counsel for plaintiff concede that to make out a case for a jury the "plaintiff must have had evidence to show . . . that the indictment was brought about by false testimony before the grand jury, either known to be false or which could have by fair and reasonable inquiry and investigation been known to be false." It is further conceded that "where there has been an indictment . . . such indictment . . . is prima facie evidence of probable cause and it is conclusive evidence unless the presumption be overcome by substantial evidence." It is insisted, however, that plaintiff offered substantial evidence "to afford a basis for the jury to find that the testimony so given (by the agents and servants of defendant company before the grand jury), and by the jury found to have been given before the grand jury, that plaintiff was guilty, was in fact false, that is, it was untrue"; and that plaintiff "proved either that it (the testimony) was known to be false or should have been known to be false which was the same thing." A rather detailed statement of the facts and circumstances shown by the evidence is, therefore, required. We shall omit evidence which affects only the measure of damages and evidence admitted against defendant Ira Johnson alone.

The forged check was first exhibited to Berta Bolar, the credit manager, who had previously received a phone call, purportedly about cashing the check for the wife of the employer of the party calling. The woman presenting the check wanted to buy some merchandise and take the balance in cash. The check, dated May 25, 1936, was drawn on the Plaza Bank of Commerce of Kansas City and purported to be signed by C. W. Thornton, was payable to Mrs. C. W. Thornton, and purported to be endorsed by the latter. The woman stated that she was Mrs. C. W. Thornton and correctly gave the business and home addresses of C. W. Thornton and his telephone numbers, both at the office and at his home, of which Mrs. Bolar made note. Mr. and Mrs. Thornton were not known to Mrs. Bolar, but, while the purchases were being made, Mrs. Bolar called the Plaza Bank and was advised that C. W. Thornton had a satisfactory account there sufficient to cover the amount of the check. Roy V. Hoggatt, a furniture and rug salesman, and another clerk waited on the woman, who made purchases for a total of $115.89. The check and sales tickets were returned together. Mrs. Bolar ok'd the check and Blanche Slyback, the cashier, then cashed the check and paid the difference between the amount of the sales tickets and the amount of the check to the woman in cash.

The address given for the delivery of the furniture, proved to be a vacant lot next door to a Piggly Wiggly store. A few days later the check was returned by the bank, as a forgery. When it reached Mrs. Bolar, she called the Schulze Baking Company and contacted Mr. Thornton, who was employed there. She then called Frank R. Johnson, in charge of the fraud warning department of the Merchant's Association Credit Bureau, and, in accordance with the customary

procedure, gave him an oral description of the woman and sent the check down to him. She also talked to Harold L. Hart, head of the private police force of the company and in charge of special investigations and floor detectives.

The Merchants Association Credit Bureau was a non-profit corporation owned and operated by the down-town stores for the purpose of establishing individual retail customers' credit. In connection with this organization was the warning service department, "for the purpose of all retail establishments reporting checks and frauds pertaining to credit." In order to maintain the operating expense of the non-profit corporation the members of the Bureau paid for credit reports. Forged checks are photographed and warnings sent and investigations made. On receipt of the check Johnson contacted Mr. Thornton, the Plaza Bank and the bookkeeper at the Schulze Baking Company. In this connection, Johnson testified that no charge was made for this type of investigation; that, when the forged check was reported to him by Mrs. Bolar, no request was made for an investigation, since it was done in all cases; and that an investigation was presumed. He knew what was wanted and proceeded with the investigation.

From the facts furnished by the Montgomery Ward and Company employees, Johnson reached the conclusion that the forger was well acquainted with Mr. Thornton and was perhaps working in the office with him at the Schulze Baking Company. Johnson came for Mrs. Bolar and they went to the Schulze Baking Company, where she looked at the girls in the office, but found no one having the appearance of the woman who passed the check. Johnson later secured a list of former employees of the baking company. He took this list to employment agencies and secured copies of applications for employment by some of these persons. He then delivered the forged check and the applications of three or four former employees of the baking company (among them an application by plaintiff) to two handwriting experts. In submitting the documents to the experts, he merely asked for an opinion. Quite often no charge was made for such reports and, in this case, no bills were submitted to him. In such cases, if a case developed they (the experts) would be paid, or at least there would be cause for employment, but if there was no case they probably would not be paid.

About June 20, 1936, Johnson received written reports from both of these experts, whose qualifications were unquestioned at the trial, that the handwriting in plaintiff's application for employment was the same as that of the check. The letter of one expert made detailed comparisons of words, letters and figures. The other, without a detailed analysis, stated that considering fundamental characteristics of the check and plaintiff's application "it would be impossible to reach any conclusion other than that the same person wrote both the check and the application." In this connection it should be said

that many of the matters pointed out by the expert in his letter and by both in their subsequent testimony were matters easily observable by even a layman. Johnson did not know plaintiff or her husband, but on the receipt of the written opinions of the experts, he made no further investigation, instead, he contacted the Kansas City Police Department. Ira L. Johnson and Ila Miller, both of the homicide squad of the Kansas City police department, were sent to Frank R. Johnson's office, where Johnson turned over to them the forged check, the application of plaintiff and the two written opinions of the experts. The two police officers limited their investigation to an examination of the check, the application and the written opinions of the experts, and then arrested the plaintiff at her residence, at the address given in her application, and took her to the police station. At the police station the police officers had her do some writing for them for 20 or 25 minutes. They dictated and she wrote "proper words, and proper names of towns and cities" everything they asked her to write. According to plaintiff, the officers, Miller and Johnson, (Ira L. Johnson, not to be confused with Frank R. Johnson), then took the sheet of paper she had written on and talked together about whether there were any similarities. Plaintiff did not see the other paper. Johnson said to Miller, "Do you see any similarities?" Miller said, "No, I don't." Then Johnson said he saw similarities in the "R's" and said: "That is enough to hold her on." Plaintiff's husband heard one of the officers say, "I think there is some similarities." Shortly thereafter Johnson told plaintiff's husband, "I am going to have to hold her." Johnson then called Harold L. Hart (referred to, supra), and advised him of the arrest and said to bring the witnesses and come down and identify her. Hart came to the station shortly and had a conference with Johnson. Johnson, in Hart's presence, said to plaintiff's husband that he and Hart had talked it over and had agreed if he (plaintiff's husband) would raise $150 or $125 they would fix it up and let his wife go. The husband refused and said his wife didn't commit the crime.

On the following morning, the plaintiff was identified (by defendant company's employees, Hoggatt, Slyback and Bolar) as the woman who passed the forged check. The employees were present at Hart's direction. Hart and Frank R. Johnson were also present. Frank R. Johnson admitted that he was at the show-up (of arrested persons) each morning as a part of his reporting work, to check up on forgeries of the kind reported to the warning service department, since he had a world of complaints on bad checks.

After the identifications were made, plaintiff was taken to the Prosecuting Attorney's office by police officers Johnson and Miller. There police officer Ira L. Johnson signed the complaint against plaintiff. The complaint was filed before a Justice of the Peace and plaintiff was released on bond. Frank R. Johnson was present in the Justice Court on occasions, while the cause was pending there. Plain-

tiff also saw Mrs. Bolar there. With reference to Mrs. Bolar, plaintiff testified: ''She was directly in front of me, and answering a remark of Horace Guffin (plaintiff's attorney) made to me, she said, 'He just thinks everything is cleaned up. I will see to that.' '' After the case was continued several times in the Justice Court, the grand jury returned an indictment. Frank R. Johnson, Mrs. Bolar, the police officers, and the two handwriting experts testified before the grand jury. It is admitted by defendant company that Mrs. Bolar ''told the grand jury all she knew about the check transaction and the plaintiff's connection therewith.'' In her brief plaintiff says, ''apparently she (Mrs. Bolar) was the only witness before the grand jury who could have possibly given any testimony that the plaintiff was guilty.'' Plaintiff offered in evidence a transcript of Mrs. Bolar's testimony in the trial of the criminal case against plaintiff, wherein Mrs. Bolar testified that she had identified plaintiff at the police station, and further that plaintiff was the woman who gave her the check in question. Mrs. Bolar's testimony concerned only the uttering of the forged check and not the charge of forgery. Other witnesses who testified at the criminal trial (at which plaintiff was acquitted on both charges against her) were Mrs. Slyback, Mr. Hoggatt and the two expert handwriting experts, employed by the defendant company.

While some of the foregoing facts were shown by defendant company's witnesses, they are conceded and are relied upon by the plaintiff as follows: ''Frank Johnson's acts in interviewing Thornton, taking Bolar to view the employees of the baking company, obtaining the names of the former employees, securing plaintiff's application for employment, securing the opinions of the so-called experts, calling in the police, attending the police 'show-up' and there associating with the other employees of appellant there as witnesses brought by Hart, attending the grand jury and testifying as a witness in the criminal case were all acts of appellant.''

Plaintiff, testifying in her own behalf in the trial in this cause, testified that she was born at Nevada, Missouri in 1902; that at an early age she came to Kansas City where she had since lived most of the time; that she had been married three times, and had been divorced once; that she had had two children by each prior marriage and one by the last; that her husband was employed by the Kansas City fire department; that she had been employed as a biller of merchandise and later as a comptometer operator; that, aside from the arrest here, she had never been arrested or charged with any crime; that she had worked for Milgram Stores, Piggly Wiggly-Bird Company and Schulze Baking Company; that C. W. Thornton had been an officer of the last two companies, when she was working for them; that she was familiar with his signature, since he signed the payroll checks; that the signature on the forged check was not Mr. Thornton's signature and did not resemble it; that she knew nothing of his private

banking account, or other personal affairs; and that she made the application for employment, dated April 23, 1936, which was secured by Frank R. Johnson and compared with the forged check (the application recited she had not been divorced, but was married and had one child). In this application plaintiff had written the name "C. W. Thornton," at two different places and had also written the name "Evelyn Norton."

Plaintiff testified that she did not write the forged check; that she was at home all day on May 25, 1936 (the day the check was passed) ; and that she was washing and doing some baking. She also fixed the date in other ways. The details of this evidence are unimportant here. Plaintiff was corroborated by her twelve year old daughter (who was home during the noon hour) and by a next door neighbor woman. A groceryman, corroborated plaintiff concerning certain details of her testimony, although it does not appear that he saw her on that date. He said his delivery boy, on Monday morning, May 25, 1936, brought in $3.00 from plaintiff in payment of a $3.00 loan made to her the preceding Saturday. The grocer's delivery boy did not testify.

At the time of her arrest on June 22, 1936, plaintiff was not asked where she was on May 25, 1936 and she did not tell anyone. On cross-examination she testified that at the time of her arrest she didn't know where she was on May 25, 1936, but found out after she had given bond and been released. She "had to check up" to see where she was on the date the check was passed. Plaintiff also testified that on May 25, 1936, she was out of employment; that her husband's salary had been reduced 50% and to $70.00 per month; that she had an automobile on which the monthly payments were between twenty-eight and thirty dollars per month, a washing machine on which the monthly payments were $4.00 per month; a Frigidaire on which the monthly payments were five to six dollars per month, a gas range on which the monthly payments were around $3.00 per month, and furniture on which the monthly payments were around ten to twelve dollars per month. Plaintiff further testified that she borrowed $3.00 in cash from her groceryman on Saturday, May 23, 1936, to buy gasoline for a trip to the Ozarks and that she paid it back to the groceryman's delivery boy on Monday morning, May 25th.

Plaintiff offered parts of the answer of defendant company in evidence, as admissions, concerning (1) the names and positions of defendant company's employees, who saw the woman that passed the check; (2) the employment of Harold L. Hart "in the capacity of superintendent of house police"; (3) the defense of defendant company that the plaintiff in fact passed the forged check, and (4) the following facts, to wit, (a) that Hart talked to the employees concerned about the check and the facts and circumstances connected with cashing it; (b) that Hart notified the Kansas City police and talked to police officers, Ira L. Johnson and Ila Miller; (c) that said police officers from time to time sought information from defendant

company's employees concerning the cashing of the check; (d) that said officers made the arrest; (e) that the said employees of defendant company did go to the police station and identify plaintiff; and (f) that Berta Bolar did appear and testify before the grand jury. Defendant company was, thereafter, permitted to have its entire answer read. The answer, further, admitted that defendant company employed two handwriting experts to make an examination and comparison of the handwriting on the check and the known genuine handwriting of the plaintiff. Evidence in the record further showed that, since said date, defendant company paid said experts for their services at the trial of the criminal case and that they expected to be paid for their services in this trial.

Plaintiff, over the objection of defendant company that the question of the guilt or innocence of plaintiff was not "an issue in chief in this case," was permitted to show by a handwriting expert that the forged check and plaintiff's application for employment were not written by the same hand. Defendant company, thereafter, offered the two handwriting experts originally consulted by Frank R. Johnson, who said the documents (check and application) were by the same hand. In this connection we may say that defendant company's answer did not charge that plaintiff had in fact forged the check, but it did expressly allege that plaintiff uttered the forged check.

Plaintiff offered in evidence the forged check, plaintiff's application for employment, the exhibits written by plaintiff for the police, the indictment by the grand jury and other exhibits. It is unnecessary to review the evidence offered by the defendants. It is sufficient to say that Mr. Hoggatt and Mrs. Slyback again identified plaintiff as the woman that cashed the forged check. Mrs. Bolar and Hart were not called by defendant company.

Actions for malicious prosecution are not favorites of the law. The reasons are well stated in Bonzo v. Kroger Grocery & Baking Company, supra (344 Mo. 127, 134, 125 S. W. (2d) 75). The necessary elements to sustain such actions must appear from the evidence. Higgins v. Knickmeyer-Fleer Realty & Investment Co., supra (335 Mo. 1010, 74 S. W. (2d) 805, 814).

We have seen that one of the indispensable elements of an action for malicious prosecution is want of probable cause, that is that the original proceeding was instituted, resorted to or pursued causelessly or without probable cause. One question raised by the demurrer to the evidence was whether or not there was substantial evidence tending to show the defendant company did not have probable cause for the arrest, indictment and prosecution of plaintiff. Laughlin v. St. Louis Union Trust Co., 330 Mo. 523, 50 S. W. (2d) 92, 93.

At the request of plaintiff the court told the jury that "by 'probable cause' . . . is meant reasonable grounds for belief supported by circumstances sufficiently strong to warrant a reasonably prudent man, in good faith, to believe that the accused was guilty of

the offense charged." See, Foster v. Chicago, B. & Q. R. Co., 321 Mo. 1202, 14 S. W. (2d) 561, 570. Of course, if it appears that there was probable cause for the arrest, indictment and prosecution of plaintiff such fact constitutes a complete defense to this action for malicious prosecution. The burden of proof to show want of probable cause was upon the plaintiff.

In this case there was an indictment by the grand jury which, as stated, supra, constitutes prima facie evidence of probable cause and becomes conclusive thereof unless the inference or presumption arising therefrom is rebutted and overcome by substantial evidences in support of plaintiff's instruction that the defendant company obtained or procured the indictment of plaintiff "by false testimony be- fore the grand jury, which testimony, if any, was known by said agents and representatives of Montgomery Ward and Company to be false, or which they could by reasonable care and due diligence have ascertained to be false, if the same was false." In view of the submission, supra, unless the proof was sufficient to support such a finding there was no case for a jury.

Plaintiff points out that Mrs. Bolar, Frank R. Johnson and the two handwriting experts, employed by defendant company, appeared and testified before the grand jury and she insists that a jury could infer and find that Mrs. Bolar testified before the grand jury to the same effect that she did in the trial of the criminal case and that a jury could infer that the testimony of the other witnesses before the grand jury was the same as their testimony in the trial of this case. Steppuhn v. Chicago Great Western R. Co., 199 Mo. App. 571, 204 S. W. 579, 582. Plaintiff says that the evidence in support of her alibi, to wit, that she was at home all day on Monday, May 25, 1936, was sufficient to sustain a finding by the jury that the testimony, about her presenting (uttering) a forged check to defendant company on that date, was false and untrue; that plaintiff's denial that she wrote the forged check and the evidence of her handwriting expert, that the check and the application for employment by plaintiff were not by the same hand, were sufficient to sustain a finding that the testimony (about the check being in her handwriting) was false and untrue; and accordingly, that plaintiff did not forge or utter the forged check.

Plaintiff next contends that there was evidence from which the jury could infer and find, either that the false testimony given before the grand jury by defendant company's employees was known to be false, or that it could by reasonable care and due diligence have been ascertained to be false. On the first proposition plaintiff contends that there was substantial evidence that the prosecution was not in good faith to subserve the public interest, but was an illegal and criminal scheme to extort money (the intentional misuse of criminal process for an unlawful purpose) ; and that the evidence was sufficient for the jury to find that "these agents did not say that plaintiff was guilty

374

because they in good faith believed she was guilty, but that they were saying that she was guilty in order to extort money from her.'' In this connection reference is made to the testimony of plaintiff and her husband about statements by defendant Ira L. Johnson (most of them admitted only as to defendant Johnson) that plaintiff was in a ''tough spot''; that defendant company's employees had been out to her house and identified her; and that he (Ira L. Johnson) and Hart had agreed that if $150 or $125 was paid, they would fix things up. Plaintiff says this evidence was sufficient to afford a basis for the jury to find defendant company and its employees did not even believe plaintiff was guilty; that defendant was not charging plaintiff with being guilty because it in good faith believed she was; but that defendant was saying that she was guilty in order to accomplish its unlawful end, which was extortion, and, therefore, defendant and its witnesses *knew* the evidence given against plaintiff was false when it was given. There is no substantial evidence to support this contention.

Plaintiff's petition alleged that the forged check, particularly described, was on or about May 25, 1936, by some person, unknown to plaintiff, presented to the defendant company; that the check was cashed; and that such unknown person received the proceeds thereof in merchandise or cash. It is clear from the record that the cause was tried on the theory that the check in question was in fact forged; that it was cashed by someone; and that the person cashing the same obtained $125 to $150 in cash from defendant company. Plaintiff's counsel offered the check in evidence and plaintiff testified that it was not signed by ▮▮▮ Mr. Thornton. Plaintiff and her husband further testified that Hart, on some pretext, came to their home (to the porch steps) about two weeks before the arrest of plaintiff; and that plaintiff came out on the porch and talked to him, while some women wearing dark colored glasses sat in his automobile and stared at plaintiff. It is also apparent that plaintiff's husband recognized that Johnson's statement, supra, was only a request for the refund of the money it was claimed plaintiff had received since his reply was ''my wife didn't commit that crime.'' In view of the conceded facts, supra, the circumstances mentioned do not tend to show the absence of an honest belief in plaintiff's guilt.

In further contending that there was substantial evidence tending to show that defendant company and its employees knew the testimony given before the grand jury (to the effect that plaintiff was guilty of the charges against her) was false at the time it was given, plaintiffs' counsel emphasize the following matters:

(1) That defendant company's employees were negligent in cashing the check; that no identification or other investigation was made; that it later appeared that the Thornton account was a joint account and subject to check by Mrs. Thornton herself; that the woman representing herself to be Mrs. Thornton didn't resemble Mrs. Thornton;

that the woman who cashed the check was very nervous (as shown by her voice and hands); that she seemed in a hurry and grabbed the money, thrust it into her purse, and departed without counting it; and that these circumstances did not create suspicion at the time.

(2) That the woman passing the check wore dark glasses and had a hat pulled down tightly over her head; that she was in defendant company's store only about thirty minutes; that defendant company's employees contacted a great many persons every day and paid little attention to their individual descriptions; and that these witnesses in their testimony given in depositions prior to the criminal trial, in the criminal trial and in this trial, the latter more than five years after the check was passed, did not in all respects agree in their description of the woman passing the check or agree with their former testimony as to her height and weight, etc. It is conceded in argument, however, that defendant company's employees did in fact personally identify plaintiff, at the time of her arrest, as the woman who passed the check; and that the indictment subsequently charged plaintiff "with having forged and uttered the check in question precisely as Bolar and other employees of appellant had stated and charged at the police station on the occasion of the arrest." Mrs. Bolar, in the transcript offered by plaintiff, testified that she identified plaintiff at the police station and at the trial as the woman who passed the checks.

(3) That the power of suggestion was used in securing the identification of plaintiff as the woman who passed the check; that on her arrest Ira Johnson called Hart and said: "I have got her down here. Come down and identify her"; that when the witnesses came to the police station for the "show-up" plaintiff's name and the charge against her was given; that a pair of glasses were put on plaintiff; that Ira L. Johnson then said: "Do you think we have it cinched?"; that Frank R. Johnson, Harold L. Hart, and the two police officers, Ira L. Johnson and Ila Miller, sat with and associated with the witnesses when the identification was made; and that the identification "was just like shooting fish in a barrel."

(4) That the handwriting experts had a motive to falsify, to-wit, since, if they said plaintiff did not write the check, they would receive no fee, but if they said she did write the check, and a case resulted, they would be paid.

While some of the matters mentioned, supra, tend to affect the credibility of the witnesses and the weight and value of their testimony and tend to show that the witnesses were in fact mistaken or their opinions erroneous, there was no substantial evidence to sustain a finding that the testimony of defendant company's witnesses before the grand jury was both false and known to be false, as required by plaintiff's instruction. Wilkinson v. McGee, 265 Mo. 574, 586, 178 S. W. 471, 474. There was no evidence from which a jury could infer and find that the witnesses did not honestly and sincerely believe

376

that plaintiff was in fact guilty as charged. In view of the particular facts of this case as shown by plaintiff's evidence and the conceded facts, we must hold that evidence that the witnesses were in fact mistaken in their identification of plaintiff as the one who uttered the forged check, or that the experts were mistaken in their opinion that the check was in plaintiff's handwriting, would not sustain a further inference (based on the fact that they were mistaken) that they were knowingly mistaken, were guilty of perjury and didn't even believe that plaintiff was guilty. Bonzo v. Kroger Grocery and Baking Co., supra.

 While the plaintiff expressly denied that she wrote or passed the forged check and was corroborated by her handwriting expert and her alibi witnesses and while, if plaintiff's evidence was true, the testimony of the defendant company's employees before the grand jury, and subsequently, was untrue, yet the essential issue in a malicious prosecution case is not the guilt or innocence of plaintiff, but the presence or absence of probable cause for the prosecution. Bonzo v. Kroger Grocery & Baking Co., supra (344 Mo. 127, 134, 125 S. W. (2d) 75); Wilkinson v. McGee, supra (265 Mo. 574, 582, 178 S. W. 471); Lindsay v. Bates, 223 Mo. 294, 306, 122 S. W. 682. Counsel do not contend that "mere proof of innocence of itself alone under all circumstances makes a submissible case" for plaintiff, nor "that mere evidence of innocence itself without regard to the details and character of such evidence is enough to overcome the presumption of probable cause" by reason of the indictment. It is insisted, however, that plaintiff's evidence went far beyond mere proof of plaintiff's innocence. Among the cases cited are Dawes v. Starrett, supra; Foster v. Chicago, B. & Q. R. Co., supra; Randol v. Kline's Inc., 322 Mo. 746, 18 S. W. (2d) 500, 505, 330 Mo. 343, 49 S. W. (2d) 112, 115; and Steppuhn v. Chicago Great Western R. Co., supra (204 S. W. 579, 582). In these cases the inference could be drawn that the testimony of the witnesses was in fact false and perjured. In the latter case, where plaintiff was arrested by special agents watching for car robbers, the agents testified they saw plaintiff take boxes of prunes from a freight car and hide the boxes, whereupon, the arrest was made. Plaintiff denied the statements of the special agents. Plaintiff was indicted, tried and acquitted. In the trial of the malicious prosecution suit the evidence was clear cut, either the agents saw plaintiff and arrested him in the act of robbing the car or else their testimony was false and known to be false. The court said: "There could have been no mistake on the part of Hall and Burke as to what occurred at the scene of the arrest." A somewhat similar situation existed in the Foster case (14 S. W. (2d) 561, 569, 571), in the Randol cases (18 S. W. (2d) 500, 505, 49 S. W. (2d) 112, 115), and in the Dawes case (336 Mo. 897, 921, 82 S. W. (2d) 43). See, also Polk v. Missouri-Kansas-Texas R. Co., 341 Mo. 1213, 111 S. W. (2d) 138, 140, 143. In these cases "the witnesses for the prosecution and the wit-

nesses for the defense had equal knowledge of the material facts."
A jury could infer that the testimony of one group was intentionally
false. Bonzo v. Kroger Grocery & Baking Co., supra (344 Mo. 127,
132, 125 S. W. (2d) 75).

Was there substantial evidence that the indictment was secured
by false testimony, which defendant company, its agents and repre-
sentatives, could by reasonable care and due diligence have ascertained
to be false? Counsel say, "It is not alone whether the agent had
actual knowledge that the evidence was false but it is also whether
the agency could have known by reasonable diligence and investigation
that it was false." Defendant company was, of course, "chargeable
with having knowledge of the facts before the prosecution was in-
stituted which they could have learned by due diligence." Foster v.
Chicago, B. & Q. R. Co., supra (14 S. W. (2d) 561, 570); Stubbs v.
Mulholland, 168 Mo. 47, 67 S. W. 650. "The plaintiff is not confined
to the proof of such facts as he can affirmatively show were actually
known to the defendant; he may also prove the existence of such open
and notorious facts as the defendant would or should have ascertained
had he, before instituting the proceedings, made such inquiry and
investigation as any man with honest motives, and not actuated by
malice, would have made." 34 Am. Jur, 785. sec. 140; 18 R. C. L. 53,
sec. 34.

Counsel state: "That defendant's representatives instigating the
prosecution should (by the exercise of care and due diligence) have
known that such evidence (against plaintiff) was false, and hence
are held to have known, is demonstrated by evidence that there were
patent, open and easily discoverable facts demonstrating that it was
impossible for plaintiff to have been guilty; and hence defendant could
not legally have had probable cause to believe her guilty." In argu-
ment, counsel deal particularly with the charge of uttering the forged
check and plaintiff's alibi rather than the charge of forgery and
plaintiff's evidence that the check was not in her handwriting. It is
insisted that there was substantial evidence that a fair, honest and
reasonably diligent investigation would have disclosed that the plain-
tiff was not guilty; that the facts, showing it was impossible
for plaintiff to have been guilty, "were lying about loose, so easily
discoverable that any reasonable investigation would have brought
them into the open"; that "the jury had the right to find, as it did
find, that defendant should have known of these facts"; and that
"the defendant must in law be held to have known them" and to have
known plaintiff was not guilty.

"However, it is not the rule that one must in all cases exercise any
diligence or effort for the purpose of ascertaining whether there
are facts other than those which have come to his knowledge. If the
facts would warrant an ordinarily prudent person in believing that
another had committed a crime, the failure to make further investiga-
tion before instituting a prosecution does not constitute a want of

probable cause.'' 34 Am. Jur. 736, sec. 51. See, also, 5 A. L. R. 1695 et seq., and cases cited; Christian v. Hanna, 58 Mo. App. 37, 45. Where, also, the ascertainable facts would not have tended to show the improbability of plaintiff's guilt or have tended to persuade a reasonable man that plaintiff was incapable of the crime, it is immaterial that such facts were not discovered. Smith v. Glynn (Mo. App.), 144 S. W. 149, 152.

It is apparent from the record that defendant company relied upon the identification of plaintiff by employees holding responsible positions with defendant company. The character and reputation of these employees is unimpeached. There is no evidence to show a want of ordinary care in relying upon their testimony. There is nothing in the record from which an inference can be drawn that defendant company's credit manager, cashier and furniture salesman were not honest in their belief that plaintiff in fact uttered the forged check, or that defendant company's handwriting experts did not believe that the forged check was in plaintiff's handwriting. There is no evidence from which an inference can be drawn that defendant company or any of its employees knew that plaintiff was innocent of the charges against her. The evidence is entirely consistent with a case of honest mistake in identification and does not furnish any basis for a reasonable inference to the contrary. Any such conclusion could only be based upon suspicion or speculation.

Plaintiff's application for employment disclosed that she was a housewife. It stated where she had been previously employed, the kind of work she had done, that she was married, had one child and had never been divorced. Plaintiff in effect concedes that she intentionally misstated the facts in her application for employment, but says it ''was at the instigation of Mrs. Lohrman.'' Defendant company had knowledge of the content of the application. Except for the opinions of the two handwriting experts and the evidence of its three employees that the plaintiff presented the check, the defendant company made no investigation. A further investigation would have disclosed a different state of facts from that shown in plaintiff's application, to-wit, that plaintiff had five children, had been married three times, divorced once and had two of her children residing with her. It would have shown that her husband was employed by the city fire department and had been so employed off and on for twelve years; and that plaintiff had never previously been arrested or charged with a crime. In view of the misstatements in the application for employment these facts would not have tended to show that plaintiff was innocent. Counsel say that an investigation would have disclosed a good reputation, since there was nothing against her, and that a person of good reputation is presumed not guilty of the charge. There was no evidence as to plaintiff's good reputation, only evidence that she had not been charged with or convicted of a crime, and that she intentionally misstated facts in an effort to obtain employment.

According to the plaintiff, only two persons saw her at her home after 8:30 A. M. on Monday morning, May 25, 1936, that is, after her twelve year old daughter left for school. They were Mrs. Helen Curtis, a neighbor, who was there all morning and Joe Nolan, a delivery boy, who came three times during the morning. The information as to plaintiff's alibi could have reasonably been secured only from plaintiff herself. The same is true as to plaintiff's financial obligations and the fact that she did not write the check. Even plaintiff had to "check up," after her arrest and release on bond, to determine where she was on the date mentioned. The alibi, if true, did not defeat the forgery charge or show that plaintiff could not have been guilty thereof. The failure of defendant company to contact plaintiff prior to her arrest, to inquire as to her whereabouts on the day in question, to determine the existence of an alibi, or to ask her whether she in fact forged the check ▮▮▮ was not a failure to exercise due diligence. Bonzo v. Kroger Grocery & Baking Co., supra; Miller v. Chicago, M. & St. Paul Railroad Co. (West Dist. of Mo.), 41 Fed. 898, 910. The other facts mentioned would have been insufficient to make a submissible case on the issue that such "facts would have convinced a reasonably prudent man that plaintiff was not guilty of the crimes with which she was charged in the indictment."

We hold that upon a most favorable view of the whole evidence there was no substantial evidence either that defendant company, its agents and representatives knew the testimony presented to the grand jury against the plaintiff was false, or that defendant failed to exercise reasonable care and due diligence to ascertain that the charges against plaintiff and the testimony in support thereof before the grand jury and later in the criminal trial, was false and untrue. The prima facie proof of probable cause made by plaintiff's own evidence was not overcome. Bonzo v. Kroger Grocery & Baking Company, supra.

The court erred in failing to sustain the demurrer to the evidence at the close of the whole case. It is unnecessary to consider other assignments of error. The judgment for plaintiff is reversed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.

ON MOTION FOR REHEARING.

DALTON, C.—▮ On motion for rehearing respondent contends that the opinion, supra, squarely conflicts with the case of Stubbs v. Mulholland, 168 Mo. 47, 67 S. W. 650, 651; that under the evidence in the record "there was an absolute duty upon defendant to make decent inquiry as to available facts, which would have shown that it was highly unlikely that plaintiff would commit the crime charged; and

that such failure under the settled law of the state was sufficient for the jury to believe and find that the prosecution was reckless and without probable cause." In the opinión, supra, we ruled that plaintiff did not make a case for the jury because the prima facie proof of probable cause shown by plaintiff's own evidence was not overcome. The motion for rehearing is not directed to this particular issue.

In the Stubbs case, the plaintiff in the malicious prosecution suit had been discharged upon preliminary hearing and it was held that proof of such "discharge of the plaintiff established prima facie a want of probable cause." (168 Mo. 47, 73.) The court further said: "That probable cause was wholly lacking in this case is shown prima facie by the discharge of the accused. This alone would call upon defendants for their defense." (168 Mo. 47, 77.) In the case at bar, respondent concedes and pleads the fact of her indictment by a grand jury and her own instructions offered at the trial conceded that in order to overcome the prima facie proof of probable cause arising from the fact of such indictment it was necessary for her to prove that defendant "acting through its agents and representatives as aforesaid, did wilfully, maliciously and without probable cause aid, advise or procure the finding of said indictment by false testimony before the grand jury, which testimony, if any, was known by said agents and representatives of Montgomery Ward and Company to be false, or which they could by reasonable care and due diligence have ascertained to be false, if the same was false."

In the Stubbs case the court said: "In order to support such an action as that of the case at bar, two ingredients must come together; first, malice on the part of the prosecutor; second, the want of probable cause for the prosecution. Absent either of these, the action for malicious prosecution fails. . . . And it has been ruled that whenever a prosecution is shown to have been made without probable cause, there the burden is cast upon the defendant's shoulders to show want of malice." (168 Mo. 47, 74.) The court further said: "Proof of malice does not prove want of probable cause. 'Malice, however, need not be proved by direct and positive testimony, but may be inferred from the facts which go to establish the want of probable cause; and this is all that is meant when it is said that malice may be inferred from want of probable cause.' Sharpe v. Johnston, 59 Mo. l. c. 575, 576." (168 Mo. 47, 75.)

After holding that "the discharge of the plaintiff established prima facie a want of probable cause" the court turned to the evidence on the issue of malice on the part of ▆ prosecutor. Dealing with such issue the court said: " 'Malice may not only be presumed from the total absence of probable cause; but also from gross and culpable negligence in omitting to make suitable and reasonable inquiry.' Wiggin v. Coffin, 3 Story C. C. 1. Did defendants, or either of them, or those acting under them, make such suitable and reasonable inquiries?" (168 Mo. 47, 77.)

There was affirmative evidence of the good character and reputation of the plaintiff in the Stubbs case, (168 Mo. 47, 58, 62), and other evidence of plaintiff's innocence. After the discussion of the evidence at some length with reference to the absence of such inquiries by defendants, the court finally held: "The failure, therefore, on the part of Mulholland and of his lieutenants to make inquiries of W. G. Thompson, plaintiff's partner, when inquiries were so easy, and ascertainment of truth so sure, was therefore the failure to make suitable and reasonable inquiries, and therefore, under the precedent authorities, proof of gross and culpable negligence, and, therefore, proof of malice. . . . For, . . .; if the prosecution is reckless and unreasonable and instituted with a gross disregard of the rights of the party to be arrested, then proof of these things proves malice, and, malice being proven, is exclusively for the determination of the jury." (168 Mo. 47, 82-83.)

We find nothing in the holding in the Stubbs case which in any manner conflicts with our ruling, supra. It is apparent that failure to investigate the plaintiff's reputation and character in the Stubbs case was considered by the court with reference to the issue of *malice*, while respondent here seeks to apply such holding to the issue of *probable cause* in a case where plaintiff's own evidence makes a prima facie case of probable cause by reason of the conceded indictment and where there was no affirmative evidence of the good character or reputation of plaintiff. In this case in the absence of affirmative evidence of the good character or reputation of plaintiff, a jury could consider no presumption of good character or reputation on the issue of probable cause, because of plaintiff's own proof of her indictment for the offenses charged made prima facie proof to the contrary. Plaintiff failed to make a case solely because her evidence failed to show that defendant acted without probable cause, but on the contrary plaintiff showed that defendant had probable cause for the prosecution.

The statement by the court in the Stubbs case that "such inquiries (concerning the good character and good reputation of Stubbs) were 'ascertainable facts' having a direct and pertinent bearing on the question of probable cause" cannot aid respondent under the record in this case where respondent's own evidence made out a prima facie case of probable cause, and where the burden of proof rested upon respondent to rebut the presumption arising by reason of the indictment. Respondent here must upset the fact of the indictment by showing that it was obtained by false testimony, known to be false or was obtained by testimony which was recklessly made without reasonable grounds when it could have been ascertained to be false.

We are here concerned with the question of a reasonable investigation only as it relates to the issue *of want of probable cause* for a prosecution in a case where an indictment is admitted and where a prima facie case of probable cause for the prosecution has been made out by plaintiff's own evidence. We are not concerned with lack of *such*

*investigation on the issue of malice.* The question of investigation or no investigation prior to the prosecution is material in this case only if the evidence (1) showed open and notorious facts which would have convinced a reasonably prudent man that plaintiff was not guilty (and, therefore, that the testimony upon which the indictment was obtained was false and untrue), and (2) that defendant knew such open and notorious facts or by such an investigation as a reasonable man actuated by honest motives would have made would have discovered such facts. In the case at bar, unless there was evidence of such facts there was no case for a jury. Plaintiff's own instructions conceded the necessity for the existence of ascertainable facts, which defendant might have discovered by due diligence, which facts would have convinced a reasonably prudent man that plaintiff was not guilty.

Two charges were made in the indictment, to-wit, forgery and uttering a forged instrument. Plaintiff and her handwriting expert denied that the check was in plaintiff's handwriting while her defense to the second charge was an alibi, all as stated in the opinion. The evidence wholly failed, as a matter of law, to show ascertainable facts discoverable by reasonable care and due diligence which would have convinced a reasonable man that plaintiff was not guilty of the crimes charged.

It is unnecessary to discuss other matters raised by the motion, since they are fully covered in the opinion. The motion for rehearing is overruled. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur except *Hays, J.,* absent.